**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LELAND FRANK SCHAFFER,      )
       )
     Plaintiff,     )
       )
    v.      )   Civil Action No. 13-1440
       )   Judge Nora Barry Fischer
CAROLYN W. COLVIN, ACTING  )
COMMISSIONER OF    )
SOCIAL SECURITY,    )
       )
    Defendant.    )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Leland Frank Schaffer ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for a period of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 §§ 404-434 (the "Act"). The record has been developed at the administrative level and the parties have brought cross-motions for summary judgment. For the following reasons the Court finds that the decision of the Administrative Law Judge ("ALJ") is affirmed. Accordingly, Plaintiff's Motion for Summary Judgment (Docket No. 12) is DENIED and Defendant's Motion for Summary Judgment (Docket No. 14) is GRANTED.

## II.    PROCEDURAL HISTORY

On November 15, 2010, Plaintiff applied for DIB, (R. at 66, 67),[1] alleging physical disability starting July 31, 2010, (R. at 68). His initial claim was denied on January 5, 2011. (R. at 78-82). He then requested a hearing by an ALJ, which was granted. (R. at 90-91). On

---

[1]    Citations to ECF Nos. 7:7-12, the Record, hereinafter "R. at __."

February 8, 2012, a hearing was held before ALJ Leslie Perry-Dowdell, which Plaintiff attended with counsel, Evan Wolfson, Esquire. (R. at 102-07). Plaintiff and a vocational expert, Samuel Edelman,[2] each testified. (R. at 121-22). On February 24, 2012, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled. (R. at 9-26). On April 23, 2012, Plaintiff filed a request to the Appeals Council to review the ALJ's decision, (R. at 7-8), and such request was denied on August 15, 2013, (R. at 1-6).

On October 7, 2013, Plaintiff, having exhausted all administrative remedies, filed a Complaint in this Court. (Docket No. 3). Defendant filed her Answer on December 31, 2013, (Docket No. 6), and later amended same on January 8, 2014, (Docket No. 9). On January 24, 2014, Plaintiff filed a Motion for Summary Judgment and Brief in Support. (Docket Nos. 12, 13). Defendant responded by filing a Motion for Summary Judgment and supporting brief. (Docket Nos. 14, 17).

## III.    FACTS

### A.    General Background

Plaintiff was born on September 11, 1957 and was fifty-two years old on the date of his alleged disability onset. (R. at 20, 67). In his application for DIB, Plaintiff alleged disability due to atrial fibrillation,[3] chest pain, low back pain and seizures. (R. at 156). He earned a GED, (R. at 74), and his work history consists of positions as a gas station attendant and as a stock person at grocery stores, (R. at 157, 166). He was laid off from his last position at the gas station in July

---

[2]    Mr. Edelman completed his Masters of Education and Rehabilitation Counseling at the University of Pittsburgh in 1973. (R. at 128-129). From 1975 to present, Mr. Edelman has been engaged in the private practice of vocational rehabilitation counseling and consultation. (*Id.*).

[3]    Atrial fibrillation is an "irregular and often rapid heart rate that commonly causes poor blood flow to the body. During [AF], the heart's two upper chambers (the atria) beat chaotically and irregularly—out of coordination with the two lower chambers (the ventricles) of the heart. [AF] symptoms include heart palpitations, shortness of breath, and weakness." *Mayo Clinic, Diseases and Conditions: Atrial fibrillation, definition, available at:* http://www.mayoclinic.org/diseases-conditions/atrial-fibrillation/basics/definition/con-20027014/ (last visited May 20, 2014).

of 2010. (R. at 156). Plaintiff is married and has no children. (R. at 139). His wife does not work because she is disabled and receives Social Security benefits. (R. at 38).

In a Function Report-Adult dated December 7, 2010, Plaintiff indicated that he lived with his wife in a mobile home and engaged in activities such as watching television, feeding the dog, spending time talking with others, and doing odd jobs around the house, which includes washing clothes and getting wood for his wood-burner. (R. at 176, 179).

### B. Medical History

Plaintiff was diagnosed with atrial fibrillation in February 2010 by his primary care physician, Dr. Wade Harvey. (R. at 385-86, 397). He continued to work after this diagnosis until he was laid off in July of the same year. Treatment notes indicate that Dr. Harvey monitored Plaintiff's condition at visits during February, May, and June 2010, (R. at 382, 383, 385), and he was prescribed Coumadin[4] and Metoprolol,[5] (R. at 381-86). As noted by Dr. Harvey, Plaintiff continued to smoke half a pack of cigarettes per day despite his heart condition. (R. at 376-86). Dr. Harvey referred Plaintiff to James Richardson, M.D., a cardiologist, for further consultation for his cardiac condition. (R. at 379, 397). Dr. Richardson treated Plaintiff for such conditions from September 2010 until November 2011. (R. at 393-97, 466-79).

In March 2010, Plaintiff suffered a seizure due to his ingestion of a combination of alcohol and Benadryl. (R. at 384). He reported the event to Dr. Harvey in April 2011, who recommended that Plaintiff discontinue alcohol use while taking his medication. (R. at 373, 384).

---

[4.] Coumadin is a brand name for an anticoagulant known as warfarin. *See Drugs.com*, "Coumadin," *available at:* http://www.drugs.com/coumadin.html (last visited May 20, 2014).Warfarin is commonly used in the prevention of thrombosis and thromboembolism, the formation of blood clots in blood vessels and their migration elsewhere in the body. *Id.*

[5.] Metoprolol is a selective beta-blocker used in treatment of several diseases of the cardiovascular system, including angina (chest pain) and hypertension (high blood pressure). *See Drugs.com*, "Metoprolol", *available at:* http://en.wikipedia.org/wiki/Metoprolol (last visited May 20, 2014).

On August 2, 2010, Plaintiff reported to Dr. Harvey that he experienced acute lower back pain while bending over. (R. at 381). He denied experiencing any symptoms related to radiculopathy and stated that he began using a back brace and analgesic cream to help ease the pain. (*Id*.). Dr. Harvey prescribed Naproxen[6] and Valium to treat the pain. (*Id*.).

Two weeks later, Plaintiff visited Dr. Harvey for a follow-up examination. (R. at 380). Although Plaintiff reported feeling much better, he still complained of mild pain when twisting his back or lifting objects. (R. at 380). Despite his report of continuing discomfort, Plaintiff requested that Dr. Harvey clear him to return to work. (*Id*.). Dr. Harvey obliged and cleared him to return to work; however, he restricted Plaintiff to lifting less than five pounds for two to three weeks and requiring him to wear the back brace for at least three more weeks. (*Id*.).

On August 27, 2010, Plaintiff suffered a seizure with syncope, during which time he fell out of bed, injured his head, and bit his tongue. (R. at 211). Plaintiff was subsequently admitted to the Southwest Regional Medical Center as an inpatient from August 27, 2010 to August 30, 2010. (R. at 226). While at the hospital, it was discovered that Plaintiff had incontinence of the bladder. (R. at 226). Upon waking up, Plaintiff was confused and tired for several minutes, (R. at 228), and had no recollection of the event that put him in the hospital, (R. at 226). During his stay, Plaintiff reported to doctors that he had suffered an earlier seizure in March 2010. (R. at 226). To control the seizures, Plaintiff was prescribed Dilantin.[7] (R. at 225, 234). Plaintiff's Dilantin levels were monitored with weekly blood tests starting on February 26, 2010 and continued to be monitored until September 27, 2010, with his dosage being changed multiple

---

[6]. Naproxen is a nonsterodial anti-inflammatory drug. *See Drugs.com*, "Naproxen", *available at:* http://www.drugs.com/naproxen.html (last visited May 20, 2014).

[7]. "Dilantin, or phenytoin, is an anticonvulsant used to treat seizures. Phenytoin works by decreasing abnormal electrical activity in the brain." *Colussy v. Colvin*, Civ. A. No.. 13-1269, 2014 WL 1766928, at n.3 (W.D. Pa. May 2, 2014).

4

times throughout this period. (R. at 365-76). Upon discharge from the hospital, Plaintiff was advised to discontinue driving. (R. at 329).

In September 2010, Dr. Harvey noted that Plaintiff's August 2010 seizure resulted from his ceasing alcohol use. (R. at 379). It was also noted that Plaintiff's Dilantin level was low; however, he remained seizure-free. (*Id*.).

At the same time, Plaintiff began treatment and consultation with Dr. Richardson. (R. at 397). He reported occasional chest paint while working in the yard, shortness of breath with exertion, and experienced fainting and dizziness. (R. at 397). Plaintiff also advised Dr. Richardson that he was then prescribed aspirin and Metoprolol. (*Id*.) On examination, auscultation of Plaintiff's heart revealed normal heart tones and no murmurs, rubs, or gallops; however, his heart had an irregular rhythm. (R. at 398). Aside from the irregular rhythm, the examination revealed no other abnormalities. (R. at 398). The previous diagnosis of atrial fibrillation was confirmed via an electrocardiogram ("EKG"), (R. at 402), and Dr. Richardson likewise diagnosed Plaintiff with chest pain, (R. at 398). Dr. Richardson ordered a nuclear stress test to be performed in October 2010, which ultimately showed a left ventricle ejection fraction of 47 percent, no evidence of infarction or ischemia, and no arrhythmias. (R. at 289-90, 395, 398). Dr. Richardson thus recommended changes to Plaintiff's medications. (R. at 398).

Dr. Harvey reported that Plaintiff's condition remained stable and that he remained seizure-free in October 2010. (R. at 378). In follow-up examinations with Dr. Richardson around the same time period, Plaintiff complained of sporadic chest pain when carrying wood or doing other manual labor, exertion which he advised led to him becoming tired. (R. at 393, 395, 468, 470, 477). After several examinations, Dr. Richardson noted that Plaintiff's heart remained "mostly normal," except for the continued irregular rhythm. (R. at 394, 396, 467, 468, 471). In

order to achieve a regular heart rhythm, Dr. Richardson adjusted Plaintiff's medication regimen, (R. at 394, 396, 469, 471, 473, 475, 478-79), and prescribed aspirin and various anticoagulants and antiarrhythmics, (*Id.*).  Dr. Richardson also advised Plaintiff to stop smoking.  (R. at 394, 396, 473, 476, 478).  In November 2010, Plaintiff underwent a successful cardioversion that converted him to normal sinus rhythm; however, his condition regressed to atrial fibrillation shortly after the procedure.  (R. at 390, 393).

Plaintiff presented for a check-up with Dr. Richardson in December of 2010 and denied experiencing an irregular heartbeat or any fainting or dizziness.  (R. at 393).  Around the same time, Dr. Harvey completed a medical source statement regarding Plaintiff's ability to perform physical activities while at work.  (R. at 414-15).  In his statement, Dr. Harvey opined that Plaintiff could frequently lift and carry up to twenty pounds and occasionally lift and carry up to one hundred pounds.  (R. at 414).  To support his recommendation on Plaintiff's work limitations, Dr. Harvey suggested that Plaintiff's atrial fibrillation and seizure disorders could worsen if he was exposed to increased strain and stress while at work.  (*Id.*).  Dr. Harvey did not set any limitations on Plaintiff's ability to stand or walk while at work and stated that he could sit for eight hours with a sit/stand option.  (*Id.*).  However, Dr. Harvey did restrict him from being exposed to heights and moving machinery (on account of him being seizure-prone), as well as humidity or extreme heat because such exposure could aggravate his atrial fibrillation.  (R. at 415).  No further explanation was provided.  (*Id.*).

In January 2011, Dr. Harvey again reported that Plaintiff's condition remained stable and that he remained seizure-free.  (R. at 458).  That same month, a heart examination by Dr. Richardson showed that Plaintiff's heart exhibited regular rhythm.  (R. at 473).  Plaintiff again denied experiencing an irregular heartbeat or any fainting or dizziness.  (R. at 477).

Dr. Harvey continued to provide Plaintiff good reports on his health in April of 2011 and noted that he had not experienced a seizure "in some time." (R. at 457). Plaintiff expressed interest in being weaned off of Dilantin. (*Id.*). In response, Dr. Harvey again noted that Plaintiff's seizure disorder was related to his stopping alcohol use in August 2010. (R. at 456).

In July 2011, a heart examination by Dr. Richardson showed that Plaintiff's heart was exhibiting regular rhythm. (R. at 475). Despite Dr. Richardson's examination, Plaintiff stated that every once in a while he would experience "a flutter," but denied any syncope or presyncope. (R. at 474).

In August 2011, Dr. Harvey began prescribing Plaintiff lower doses of Dilantin with the hopes of taking him off the drug completely. (*Id.*). Another heart examination by Dr. Richardson showed Plaintiff's heart exhibiting regular rhythm. (R. at 478). Plaintiff stated that he experienced no chest pain but experienced "rare fluttering." (R. at 270, 472). He also told Dr. Richardson that his diet was unhealthy and consisted of "pizza, meat, etc." (R. at 470). Dr. Richardson diagnosed him with hyperlipidemia. (R. at 469).

Plaintiff underwent a second cardioversion in October 2011. (R. at 466, 468, 491). However, just as he had after the first cardioversion in November 2010, he regressed within two weeks. (*Id.*). Dr. Richardson then suggested an alternative treatment option, ablation,[8] but Plaintiff was not interested in pursuing that treatment option. (R. at 469). He told Dr. Richardson that he felt a little tired at times but overall was in good health. (R. at 468). Dr. Richardson discontinued some of his medications and started him on rate control/ASA strategy with the goal to control his resting heart rate at around 80 beats per minute. (R. at 469).

---

[8]    "Cardiac ablation is a procedure that can correct heart rhythm problems (arrhythmias)." *Mayo Clinic, Tests and Procedures*, "Cardiac ablation," *available at:* http://www.mayoclinic.org/tests-procedures/cardiac-ablation/basics/definition/prc-20022642 (last visited May 20, 2014).

During a visit in November 2011, Dr. Harvey noted that Plaintiff was doing well. (R. at 455). However, Plaintiff again complained to Dr. Harvey about experiencing lower back pain, which was limiting his ability to exercise. (R. at 455, 467). Dr. Harvey diagnosed Plaintiff with muscular lower back pain and recommended rest, ice, anti-inflammatory medications, stretches, and physical therapy. (R. at 455, 489). Plaintiff attended one session of physical therapy that month but never returned for additional physical therapy. (R. at 487-88).

Also, in November 2011, Plaintiff complained to Dr. Richardson of shortness of breath while active, but denied experiencing any other symptoms from his cardiac condition. (R. at 466). Dr. Richardson noted that Plaintiff's resting heart rate was better and recorded it at 72 beats per minute. (R. at 467). Thereafter, Dr. Richardson wrote that Plaintiff's atrial fibrillation was controlled. (*Id*.). Dr. Richardson declined to complete a disability assessment for Plaintiff upon request and instead deferred any such assessment to Dr. Harvey, suggesting that his lower back pain should be evaluated by his primary care physician to determine if such condition qualified him for disability. (*Id*.).

On December 16, 2011, Dr. Harvey submitted a "Medical statement regarding heart arrhythmias for Social Security disability claim," noting that Plaintiff suffered from a diagnosis of atrial fibrillation, as determined by EKG and other tests performed by his cardiologist. (R. at 497-500). Dr. Harvey indicated by checking boxes on the form that Plaintiff exhibited symptoms of near syncope, dizziness, weakness, and shortness of breath. (R. at 499). He checked additional boxes showing that Plaintiff's symptom of near syncope occurred "about monthly" and that the other symptoms occurred more than once a week. (R. at 490). Dr. Harvey concluded his report by circling that Plaintiff could work six hours per day, stand and sit at one

time for two hour increments, lift twenty pounds frequently and occasionally, and that he needed to elevate his legs occasionally during an eight hour work day.  (R. at 500).

### C.    Plaintiff's Testimony

On February 8, 2012, Plaintiff appeared with the assistance of counsel at a hearing before the ALJ.  (R. at 29).  Plaintiff testified that his ability to work was restricted due to back pain and chest pains caused by his "a-fib".[9]  (R. at 31).  He explained that he received cardioversion treatments[10] at Washington Hospital for the "a-fib" and treated his back pain by attending physical therapy until his insurance was denied.  (R. at 31, 34).

Plaintiff summarized his daily activities as getting dressed, carrying firewood into the house for the wood burning stove, watching television, feeding his dog, and occasionally riding into town with his wife.  (R. at 32, 33).  He stated that his back hurt when having to bend down to put on his boots while getting dressed and that he requires a small break when getting firewood from outside because his chest begins to hurt after a while.  (R. at 32).  Plaintiff further explicated that he is able to attend to the firewood by carrying one piece of wood in each hand at a time and generally takes two or three trips to get the job done.  (R. at 33).  He told the ALJ that when he is out with his wife, he can only walk around a store for five to ten minutes before experiencing chest and back pain.  (R. at 34).  He also testified that he continues to clear his yard of dead sticks and other debris; however, he no longer cuts wood or makes things in his barn, relying on his brother-in-law to perform such tasks.  (R. at 38-9).

Plaintiff explained that he had reduced his consumption of alcohol and was then only drinking one day every two weeks.  (R. at 41).  He said that he belongs to no clubs or

---

[9].      In his testimony, Plaintiff referred to arterial fibrillation as "a-fib."  (R. at 31).
[10].     Plaintiff referred to his treatment as "shock treatment for the heart."  (*Id.*).

organizations and he socialized primarily with his brother-in-law, who visited on occasion.  (R. at 40).

As to his back pain, Plaintiff advised that it was triggered easily, such as when he walked to his kitchen sink and bent over to wash his hands.  (R. at 35).  He explained that elevating his feet alleviates his back pain, and he needs to do this about twenty to twenty-five times per day.  (R. at 36).  If Plaintiff's back begins to hurt in an area where he cannot easily elevate his feet, such as outside, he usually finds somewhere to sit immediately because the pain is too great for him to return to the house for a rest.  (R. at 50).

During his testimony, Plaintiff described symptoms he attributed to his atrial fibrillation, including a fast heart beat and chest pains.  (R. at 45).  He told the ALJ that he experiences shortness of breath and dizziness about once a week.  (R. at 47).  Plaintiff stated that his dizzy spells usually last about ten to fifteen minutes and cause him to sit down and rest.  (R. at 49).  Such episodes were often triggered by simply standing up.  (*Id.*).  Plaintiff also testified about his two failed cardioversions.  (R. at 51).  He stated that moving his arms makes his heart work harder and causes him chest pain.  (R. at 55).  Despite experiencing these symptoms, Plaintiff testified that he does not always alert his doctors to his dizziness and chest pain.  (R. at 48).

Plaintiff next provided information about his past work experience as a gas station attendant.  (R. at 59).  He explained that he did not ring up gas sales at a cash register but would instead be paid in cash at the pump and return change to the customers.  (R. at 59).  He added that his attendant duties did not extend to his ringing up snacks or anything sold inside the gas station itself.  (*Id.*).

### D.    Vocational Expert Testimony

A vocational expert, Mr. Edelman, also testified, without objection from Plaintiff or his counsel. (R. at 56). The vocational expert opined that Plaintiff's work as a gas station attendant was light work as it is currently performed in the national economy; however, he added that Plaintiff's past work as a gas station attendant could be considered medium work when compared to his previous jobs. (R. at 56).

The ALJ asked the vocational expert whether a hypothetical person with Plaintiff's vocational profile could perform his past relevant work or other work in the national economy if he was limited to light work. (*Id.*). The vocational expert responded that such an individual could indeed perform Plaintiff's duties as a gas station attendant, in addition to other occupations demanding similar skills. (R. at 56-57). The vocational expert noted that the traditional role of a gas station attendant has evolved and is now "significantly different;" however, the vocational expert did not explain if Plaintiff would have experienced such a difference during his time as a gas station attendant. (R. at 60). In response to additional questioning from the ALJ, the vocational expert testified that an individual with the functional profile of Plaintiff could also perform additional jobs in the national economy, such as assembler, sorter/grader and packer. (R. at 57). The vocational expert admitted upon examination by Plaintiff's attorney that there would be no available jobs for an individual who was required to take three to four additional breaks of ten to fifteen minutes in duration throughout the workday. (R. at 60-61). He also responded that any alleged environmental restrictions such as avoidance of temperature extremes would not impair the hypothetical individual's ability to perform work as a gas station attendant because it was an indoor job. (R. at 59).

## IV.    Standard of Review

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period if not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). In order to comply with this definition, a claimant must have a severe impairment or impairments that make the claimant unable to perform previous work duties or any other substantial gainful work duties that exist in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). In response, the Commissioner must follow a five-step analysis to evaluate the claims made by the claimant and to verify that the claimant satisfies the requirements under the Act. 20 C.F.R. §§ 404.1520, 416.920. The burden of proving disability ultimately lies with the Plaintiff. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a). However, if it is determined that the claimant is unable to return to his previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education, and work experience, he is able to perform gainful activity in other jobs available in the nation economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Employing the five-step analysis, the Commissioner must determine: 1) whether the claimant is currently engaged in substantial gainful activity; 2) if not, whether the claimant has a severe impairment or a combination of impairment that is severe; 3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; 4) whether the claimant's impairments prevent him from performing his past relevant work; and 5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the

national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003).

Judicial review of the Commissioner's final decision on a disability claim is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[11] 1383(c)(3);[12] *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court then reviews the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial

_____

[11]    Section 405(g) provides:

>       Any individual, after any final decision of the [Commissioner] made after a
>       hearing to which he was a party, irrespective of the amount in controversy, may
>       obtain a review of such decision by a civil action . . . brought in the district court
>       of the United States for the judicial district in which the plaintiff resides, or has
>       his principal place of business.

42 U.S.C. § 405(g).

[12]    Section 1383(c)(3) provides:

>       The final determination of the Commissioner of Social Security after a hearing
>       under paragraph (1) shall be subjection to judicial review as provided in Section
>       405(g) of this Title to the same extent as the Commissioner's final
>       determinations under Section 405 of this Title.

42 U.S.C. § 1383(c)(3).

evidence, then they are conclusive. *Id.* (citing *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)); 42 U.S.C. § 405(g). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision not can it reevaluate the evidence contained in the record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-7 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-7. Further, even where this court, acting *de novo*, may have reached a different conclusion, "so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Enstein Med. Ctr. v. Seblius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986)).

## V.   DISCUSSION

### A.  The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2015, and that he did not engage in substantial gainful activity during the period starting with his alleged onset date of July 31, 2010. (R. at 14). (*Id.*). Although Plaintiff acknowledged earning nearly ten thousand dollars in 2010, the ALJ concluded that his earnings were not significant enough to constitute his having performed substantial gainful activity during the relevant period. (*Id.*).

The ALJ determined that Plaintiff had the following severe impairments: chronic atrial fibrillation; low back pain and a history of seizures but held that none of Plaintiff's impairments,

nor a combination thereof,[13] met or medically equaled the severity of impairments listed in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (*Id.* at 15). The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) (lifting up to 20 pounds occasionally and 10 pounds frequently; standing or sitting 6 hours of an 8-hour work day; and taking normal breaks) except that he must avoid exposure to hazards, such as machinery and heights.

(*Id.*). In support of the RFC finding, the ALJ provided a detailed evaluation of the evidence, including a discussion of Plaintiff's allegations, the relevant medical evidence and the opinion evidence from his primary care physician, Dr. Harvey, who submitted two different medical source statements during the course of his treatment of Plaintiff. (*Id.* at 16-20). The ALJ largely rejected the second medical source statement supplied by Dr. Harvey, holding that it was inconsistent with the other evidence of record, particularly the first medical source statement submitted only a year prior, wherein Dr. Harvey detailed that Plaintiff was capable of working an eight hour day and demonstrated that he was able to perform a broader range of functions. (*Id.*). The ALJ also concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but his "statements concerning the intensity, persistence, and limiting effects of his symptoms" were not credible to the extent that they were inconsistent with the RFC. (R. at 20). The ALJ continued that Plaintiff was capable of returning to his past relevant work as a gas station attendant and alternatively found that he was functionally able to perform other light, unskilled positions in the national economy, i.e., assembler; sorter/grader; or packer. (R. at 20-21). Finally, the ALJ held that Plaintiff was not

---

[13]    The ALJ specifically noted that she considered Plaintiff's obesity in accordance with the relevant regulations and concluded that the combination of such impairment, along with Plaintiff's other impairments, did not render him disabled. (R. at 14-15). Plaintiff has not asserted any error in the ALJ's analysis of his obesity on appeal. (Docket No. 13). Accordingly, the Court does not address his obesity in detail here.

under a disability, as defined under the Act, from July 31, 2010 through February 24, 2012, and denied his claim for DIB. (R. at 21-22).

### B. Plaintiff's Objections to the ALJ's Decision

Plaintiff argues the following on appeal before this Court: (1) the ALJ erred in assessing Plaintiff's RFC finding that Plaintiff could perform a range of light work; (2) the ALJ improperly disregarded Dr. Harvey's medical opinion; (3) the ALJ wrongly excluded certain nonexertional limitations in the RFC finding; (4) and the ALJ did not appropriately evaluate Plaintiff's credibility. (Docket No. 13). Defendant responds that the ALJ's decision was supported by substantial evidence. (Docket No. 17). For the following reasons, the Court agrees with Defendant that the ALJ's decision to deny Plaintiff's claim for DIB is supported by substantial evidence.

### C. Analysis of Plaintiff's Arguments

Plaintiff's assertions of error all relate to the ALJ's RFC determination that he was capable of performing light work with certain limitations and the ALJ's underlying evaluation of the evidence and factual findings provided in support of that decision. (Docket No. 13). It is well established that "[t]he ALJ-not treating or examining physicians or State agency consultants-must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). RFC is defined as "the most you can still do despite your limitations. [The ALJ] will assess [a claimant's] residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). Relevant evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 43. Although the ALJ must consider all of the relevant medical

evidence when formulating the claimant's RFC, she need only include limitations which are credibly established. *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir. 2008). Credibility determinations are within the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). "When making credibility findings, the ALJ must indicate which evidence [she] rejects and which [she] relies upon as the basis for [her] finding." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 146 (3d Cir. 2007).

Here, Plaintiff challenges the ALJ's RFC assessment that he was capable of performing "light work … except that he must avoid exposure to hazards, such as machinery and heights." (R. at 15). "A full range of 'light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds,' and requires that a claimant is able to stand or walk, off and on, for a total of approximately six hours in an eight-hour day." *Schade v. Colvin*, Civ. A. No. 13-1071, 2014 WL 320133 (W.D. Pa. Jan. 29, 2014) (citing 20 C.F.R. § 404.1567, 416.967; S.S.R. 83–10, 1983 WL 31251, *5–6). Having fully considered the parties' arguments and the entirety of the administrative record developed before the agency, the Court rejects Plaintiff's overall challenge to the ALJ's RFC assessment and further finds that the ALJ provided substantial evidence in support of her RFC determination in light of Plaintiff's severe impairments of atrial fibrillation, low back pain, and seizure disorder and her ultimate decision to deny benefits in this case. *See Hagans*, 694 F.3d at 292. The Court now details its reasons for overruling each of Plaintiff's more specific objections, in turn.

1. Dr. Harvey's Opinions

Plaintiff first challenges the ALJ's evaluation of the opinions of his primary care physician, Dr. Harvey.[14] (Docket No. 13). Plaintiff contends that the ALJ violated the treating

---

[14] The Court agrees with the Commissioner that the ALJ erroneously referred to Dr. Wade Harvey as "Dr. Wade" at times in her decision. (*See* R at 17-20). But, it is the Plaintiff's burden to demonstrate disability, *see* 42

physician doctrine by rejecting a December 2011 opinions regarding Plaintiff's functional abilities by Dr. Harvey as inconsistent with his prior December 2010 medical source statement and the remainder of the information in the medical records. (*Id.*). He further alleges that the ALJ substituted her own lay opinion of Plaintiff's ability to work for that provided by Dr. Harvey, a trained medical physician. (*Id.*). Defendant maintains that the ALJ appropriately weighed all of the evidence of record and did not err in her decision to grant little weight to Dr. Harvey's December 2011 opinions. (Docket No. 17). The Court agrees with Defendant.

The medical opinions of treating physicians are generally entitled to substantial and possibly controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201–02 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); S.S.R. 96-5P, 1996 WL 374183, at *4. However, in order to be given greater weight, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In weighing relevant medical evidence, the ALJ may choose which opinions to accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may generally be rejected outright only on the ground of contradictory medical evidence. *Id.*

In this Court's estimation, the ALJ provided a sufficient rationale for rejecting Dr. Harvey's December 2011 opinions that Plaintiff could: only work six hours per day; stand and sit

---

U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a), and such typographical errors had no bearing on the ALJ's disability determination, which the Court believes is supported by substantial evidence.

for only two hours at a time; frequently and occasionally lift 20 pounds; and occasionally needed to elevate his legs during an eight hour work day. (R. at 500). It appears that the ALJ's acceptance of such opinions would have likely resulted in a decision that Plaintiff was unable to perform light work but the ALJ appropriately discredited such evidence by pointing to substantial medical evidence in the record which was inconsistent with these opinions. *See* 20 C.F.R. § 416.967.

To this end, Dr. Harvey previously filled out a similar medical source statement form assessing Plaintiff's functional abilities in December 2010, wherein he opined that Plaintiff: was able to frequently lift and carry up to twenty pounds and occasionally lift and carry up to one hundred pounds; could work for eight hours with a sit/stand option; had no limitation in his ability to stand and walk; could sit for a period of eight hours with a sit/stand option; and was frequently able to engage in postural activities and physical functions listed on the report. (R. at 414-15). The ALJ then reviewed the intervening treatment notes by Dr. Harvey and properly concluded that the medical notes contained therein did not demonstrate any significant changes in Plaintiff's severe impairments of atrial fibrillation, low back pain and seizure disorder which would warrant the more significant restrictions in Plaintiff's functional abilities. (R. at 455-459). In his initial medical source statement, Dr. Harvey provided some environmental restrictions, which are addressed in the context of Plaintiff's challenge to same below; but, on balance, his December 2010 opinions plainly exhibit that he believed that Plaintiff maintained sufficient functionality to support a finding that he was capable of performing light work under the Act. (*Id.*). Because Dr. Harvey's December 2010 opinions were made during the timeframe of Plaintiff's claim for DIB (i.e., July 31, 2010 through February 2012), they constitute significant evidence of Plaintiff's ability to perform light work during the relevant period, and such

information constituted evidence with which the ALJ was tasked to weigh under the regulations and prevailing caselaw. *See Brown*, 649 F.3d at 196. Accordingly, this Court believes that the ALJ cited ample medical support for her RFC decision and did not substitute her own "lay opinion" for that of competent medical physicians, as Plaintiff complains. *See id*.

Further, the ALJ did not only evaluate the credibility of the two inconsistent medical opinions from Dr. Harvey but she fully explained her rationale for largely relying on the former opinions in favor of the latter by citing to inconsistencies between Dr. Harvey's December 2011 medical source statement and his own treatment records in the intervening period as well as the treatment notes of Dr. Richardson, Plaintiff's cardiologist. (*See* R. at 16-20). Indeed, the ALJ emphasized that Dr. Richardson, a cardiology specialist, expressly declined to even prepare a medical source statement on Plaintiff's behalf or to assess whether his cardiac conditions rendered him disabled. (R. at 467). Dr. Richardson's treatment notes from Plaintiff's cardiology check up on November 9, 2011 state that he "defer[red] [any] disability assessment to PCP … if patient's back troubles qualify him – suggest work up." (*Id.*). The ALJ reasonably inferred from this treatment note that it was Dr. Richardson's opinion that Plaintiff was not disabled as a result of the cardiac conditions for which he was providing Plaintiff consultation and treatment. (R. at 467). It is likewise apparent from this treatment note that Dr. Richardson believed that Plaintiff should be evaluated by his primary care physician, Dr. Harvey, to determine if his back troubles could qualify him for disability benefits, a condition for which he (Dr. Richardson) did not provide any assessment. (*Id.*). But, Dr. Harvey's diagnosis of Plaintiff as having muscular lower back pain during his November 2011 visit included a recommendation of conservative treatment, i.e., rest, ice, anti-inflammatory medications, stretches, and physical therapy. (R. at 455, 489). Despite this recommendation, Plaintiff attended only one physical therapy session that month

and never returned for further treatment.[15]  (R. at 487-88).  He also testified that he took only Tylenol or Ibuprofen for back pain for a period of time but discontinued same because such medications did not help.  (R. at 35-36).

In any event, Dr. Harvey's later December 2011 medical source statement did not specifically evaluate Plaintiff's back condition but contemplated his "heart arrhythmias for Social Security disability claim;" noted his atrial fibrillation and the frequency of his corresponding symptoms as: near syncope occurring monthly; and dizziness, weakness and shortness of breath occurring more than once a week.  (R. at 498).  In was within the ALJ's discretion to discredit such evidence for the additional reasons that the treatment notes by Dr. Richardson and Dr. Harvey during the relevant time period did not support the severity of Plaintiff's symptoms as suggested in the December 2011 medical source statement.  (R. at 455-459).  Although Plaintiff had a second unsuccessful cardioversion in October of 2011, the ALJ correctly found that he also refused an alternative treatment – ablation – and Dr. Richardson noted in November of 2011 that Plaintiff's atrial fibrillation was "controlled" at a time when he denied: any fainting or dizziness; dyspnea on exertion; edema; leg pain at rest; and any symptoms of stroke.  (R. at 468).   It was simply not error for the ALJ to credit the treatment notes of the specialist over the unsupported assertions of a primary care physician about the severity of Plaintiff's cardiac conditions.  *See* § 416.927(c)(5) (the ALJ will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); *see also Hauserman v. Colvin*, Civ. A. No. 13-50, 2013 WL 2557577, *6 (W.D. Pa. June 10, 2013) (citing §§ 404.1527(c)(5) and

---

[15]    The ALJ also accurately pointed out that the medical records demonstrate that Plaintiff failed to adhere to recommendations from his physicians that he alter his diet, discontinue cigarette smoking and drinking alcohol.  (R. at 17).

416.927(c)(5) and affirming the ALJ's grant of less weight to a non-specialist's opinion which was inconsistent with notes by a specialist).

Additionally, Dr. Harvey's more restrictive opinions are set forth in a form dated December of 2011 which required him to check boxes and fill in blanks, and he completed such form without providing any substantive explanation for the changes in the severity of the limitations he assessed as compared to his earlier assessment of Plaintiff's functionality. (R. at 498-500). The Court of Appeals has consistently noted that such reports constitute "weak evidence at best" and held that it is not error for an ALJ to grant little weight to information provided in such forms if it conflicts with the medical evidence of record. *See Schmidt v. Commn'r of Soc. Sec.*, 465 F. App'x 193, 197 (3d Cir. 2012) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("[F]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")). While Plaintiff suggests that Dr. Harvey's latter opinions were formed upon his consideration of a broader medical treatment history and records, (*see* Docket No. 13), such assertions are not reinforced by the form itself, which provides no real substance to explain the later findings. (R. at 498-500). In any event, the intervening medical records demonstrated that:

- Plaintiff's seizure disorder was stable, he had not sustained a seizure since August of 2010, was being weaned off of his seizure medication starting in the fall of 2011 and was no longer taking same at the time of his hearing;

- his atrial fibrillation was controlled with conservative treatment, he declined a treatment option recommended by his cardiologist and did not report a wide range of symptomatology for such impairment, but "only intermittent symptoms (moreso with exertion)"; and,

- his low back pain was muscular in nature rather than spinal and was treated with physical therapy, which Plaintiff did not attend

> and over the counter medications, which Plaintiff admitted he declined to take.

(R. at 16-20). Based on these findings, it was within the ALJ's discretion to discredit the information in Dr. Harvey's December 2011 form. Accordingly, this Court holds that the ALJ provided substantial evidence for her evaluation of the opinions of Dr. Harvey, including her decision to grant little weight to Dr. Harvey's December 2011 opinions regarding Plaintiff's functionality.

## 2. Failure to Explain Rationale for Rejecting Nonexertional Limitations

Plaintiff next complains that the ALJ failed to fully explain her rationale for rejecting certain of his nonextertional limitations as identified by Dr. Harvey, including that Plaintiff not be exposed to temperature extremes, such as heat and that increased strain and stress could worsen his atrial fibrillation and seizure disorder. (Docket No. 13). He suggests that the "ALJ provides only a brief statement disregarding the additional limitations, which does not afford this Court meaningful review." (*Id.* at 17). Defendant maintains that the ALJ provided more than sufficient support for her decision to not include these limitations. (Docket No. 17). The Court believes that Defendant's position is meritorious.

While the ALJ is required to provide an explanation of her decision, "[a] written evaluation of every piece of evidence is not required," and "the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 F. App'x 775, 780 n. 7 (3d Cir. 2004) (citations omitted). Further, it has never been required that the ALJ discuss every piece of relevant evidence, let alone evidence which does not have ready support in the objective record, *see Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir.2004) (citing *Fargnoli*, 247 F.3d at 42), and particularly when said evidence will not affect the ALJ's disability analysis, *see Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).

Additionally, limitations which are in conflict with the medical record are not required to be included in a RFC formulation. *Lynn v. Colvin*, 2013 WL 3854460, *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)).

Here, the ALJ identified all of the nonexertional limitations proposed by Plaintiff, expressly included a limitation that Plaintiff "must avoid exposure to hazards, such as machinery and heights" in the RFC and then rejected the remainder of these limitations because they were "unsupported by the expanded record." (R. at 21). Despite Plaintiff's position to the contrary, the Court of Appeals has held that "[a] lack of evidentiary support in the medical record is a legitimate reason for excluding claimed limitations from the RFC." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007). Hence, the ALJ met her burden to explain the basis for her decision and did not ignore the evidence. Further, on appeal, Plaintiff has not pointed to any evidence in the medical records undermining this finding beyond the cited opinions of Dr. Harvey, which again, are set forth in check the box/fill in the blank forms without significant explanation of Plaintiff's alleged limitations and were properly rejected by the ALJ given the inconsistencies noted at length above. (*See* Docket No. 13). Accordingly, this case is distinguishable from *Sinagra v. Astrue*, 2013 WL 2556933 *4 (W.D. Pa. Jun. 2013), upon which Plaintiff relies. In *Sinagra*, Judge Bloch held that a remand was necessary as the plaintiff pointed to relevant evidence in the record which the ALJ failed to consider in the decision denying benefits. *Id.* Such is not the case here. For these reasons, the Court believes that Plaintiff has not established that a remand is warranted so that the ALJ can further elucidate her decision to reject these otherwise unsupported limitations.

### 3. Credibility Assessment of Plaintiff's Subjective Complaints of Pain

Plaintiff last contends that the ALJ erred by discrediting his subjective complaints about the severity of his pain and misevaluated the evidence of his activities of daily living. (Docket No. 13). Defendant counters that the ALJ conducted a thorough and proper evaluation of such evidence. (Docket No. 17). In this Court's opinion, Defendant's view of the ALJ's decision on this issue is more persuasive.

The "ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). (Docket No 13 at 21). The ALJ may find subjective complaints of pain less than fully credible, however, if they are outweighed by conflicting evidence in the record. *Harkins v. Comm'r of Soc. Sec.*, 399 F. App'x 731, 735 (3d Cir. 2010). Inconsistencies between Plaintiff's testimony and daily activities may support a conclusion that a claimant is less than fully credible. *Salles*, 229 F. App'x at 146. Reviewing courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

Having fully reviewed the evidence of record, this Court sees no sound reason to disturb the ALJ's decision to discredit Plaintiff's subjective complaints of pain to the extent they were inconsistent with the RFC. (R. at 20). Again, the ALJ engaged in a detailed recitation of the evidence of record and buttressed her findings by citing significant inconsistencies between the information that Plaintiff provided in his initial application for benefits, his statements to his physicians during his various medical appointments and his testimony during the hearing. (R. at 18-20). Among the several inconsistencies, the ALJ recognized that Plaintiff stated in his initial function report completed in December 2010 that he was wearing a back brace and was restricted to carrying no more than 10 pounds. But, the ALJ astutely pointed out that Plainitff was only on

such severe restrictions by Dr. Harvey for a 2 to 3 week period in August of 2010.  Of course, as is discussed above, Dr. Harvey thereafter prepared a medical source statement in December of 2010, wherein he opines that Plaintiff could carry up to 20 pounds frequently and up to 100 pounds occasionally and was able to work eight hours a day with a sit/stand option.  (R. at 413-415).  Plaintiff also admitted during his testimony that he performed a number of household activities such as feeding his dog, doing laundry, retrieving and carrying firewood weighing 20 to 30 pounds to burn in his wood stove, and maintaining his yard by picking up dead limbs.  (R. at 19).  The Court finds no error with the ALJ's reliance on Plaintiff's daily activities as part of her evaluation of the credibility of his subjective complaints of pain.  *See* 20 C.F.R. § 404.1529 ("Factors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities.").   Given same, the ALJ's questioning of Plaintiff's credibility as a result of these and other identified inconsistencies – which need not be fully restated here – was wholly appropriate.

## VI.    CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence in the administrative record.  Reversal or remand of the ALJ's decision is not appropriate.  Accordingly, Plaintiff's Motion for Summary Judgment [12] is denied; Defendant's Motion for Summary Judgment [14] is granted; and the decision of the ALJ is affirmed.  Appropriate Orders follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:      May 20, 2014
cc/ecf:    All counsel of record.